# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | |
|---|---|
| BRANCH METRICS, INC., | Civil Action No. 2:25-cv-00089-JRG |
| Plaintiff, | |
| vs. | **JURY TRIAL DEMANDED** |
| GOOGLE LLC, | |
| Defendant. | |

## PLAINTIFF BRANCH'S RESPONSE TO GOOGLE'S MOTION TO DISMISS

**RESPONSE TO STATEMENT OF ISSUES TO BE DECIDED BY THE COURT
PURSUANT TO LOCAL RULE CV-7(a)(1)**

1.  The Court should deny Google's Rule 12(b)(6) challenge to Plaintiff Branch Metrics, Inc.'s ("Branch") antitrust standing because Google's standing and competition arguments are premature and Branch adequately alleged that it sustained textbook antitrust injury from Google's anticompetitive conduct: Branch's foreclosure from competing in the relevant markets. Google does not even dispute that Branch competes in the Android application distribution market, and that it plausibly alleged its exclusion from that market by Google's anticompetitive conduct, which means Google has no viable standing argument on Branch's claims under Section 1 of the Sherman Act and under state antitrust law (Counts 1-3, 10-11, 13-14). Google's arguments as to Branch's standing to assert its remaining claims under Section 2 of the Sherman Act (and state law equivalents) are also meritless because Branch adequately alleged antitrust injury in each of the other relevant markets.

2.  The Court should deny Google's Rule 12(b)(6) challenge to Branch's claims for unlawful tying because Branch adequately pled relevant antitrust markets for the tying and tied product markets and provided detailed allegations of the anticompetitive effects of Google's unlawful conduct in the tied product markets.

3.  The Court should deny Google's Rule 12(b)(6) challenge to Branch's claim for tortious interference with prospective contractual or business relations because Branch plausibly alleged that Google intentionally interfered with Branch's business relationships with Android OEMs and carriers through Google's unlawful exclusionary contracts that prohibited them from integrating Branch's Discovery Search, and led to the termination of, or refusal to enter, business relationships with Branch.

4.  The Court should deny Google's Rule 12(b)(6) challenge to Branch's state law antitrust claims because it is predicated entirely on Google's legally insufficient standing and tying challenges that lack merit for the reasons stated above.

# TABLE OF CONTENTS

INTRODUCTION ..............................................................................................................1

LEGAL STANDARD......................................................................................................6

ARGUMENT ..................................................................................................................6

I.     BRANCH PLAUSIBLY ALLEGED ANTITRUST STANDING.......................................6

    A.     Branch Has Antitrust Standing in the Android App Search Services
        Market   ....................................................................................................7

    B.     Branch Has Antitrust Standing in the General Search Services Market ..................13

    C.     Branch Has Antitrust Standing in the Android App Distribution Market.................20

    D.     Branch Has Antitrust Standing in the Search and Text Advertising
        Markets   ..................................................................................................22

II.    BRANCH PLAUSIBLY ALLEGED UNLAWFUL TYING ............................................25

III.   BRANCH PLAUSIBLY ALLEGED TORTIOUS INTERFERENCE ...........................27

IV.    BRANCH PLAUSIBLY ALLEGED STATE LAW ANTITRUST CLAIMS.................29

V.     IN THE ALTERNATIVE, BRANCH SHOULD BE PERMITTED TO AMEND...........30

## <u>TABLE OF AUTHORITIES</u>

*Am. Ad. Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
190 F.3d 1051 (9th Cir. 1999) ....................................................................................7

*Am. Cent. E. Tex. Gas Co. v. Union Pac. Res. Grp., Inc.*,
93 F. App'x 1 (5th Cir. 2004) ..............................................................................4, 7, 13

*Ambilu Tech. AS v. U.S. Composite Pipe S*,
2024 WL 993284 (M.D. La. Mar. 7, 2024) ...........................................................21

*Bell v. Dow Chem Co.*,
847 F.2d 1179 (5th Cir. 1979) ..............................................................................11

*BHL Boresight, Inc. v. Geo-Steering Solutions, Inc.*,
2016 WL 8648927 (S.D. Tex. Mar. 29, 2016)......................................................29

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*,
182 F.3d 1096 (9th Cir. 1999) ........................................................................12, 13

*Blue Shield of Virginia v. McCready*,
457 U.S. 465 (1982)..............................................................................................15

*In re Cal. Gasoline Spot Market Antitrust Litig.*,
2022 WL 3215002 (N.D. Cal. Aug. 9, 2022) ..................................................28, 30

*Crownalytics, LLC v. SPINS LLC*,
2023 WL 3071192 (D. Colo. Apr. 25, 2023)........................................................27

*Dexon Comp. v. Cisco Sys.*,
2023 WL 2730656 (E.D. Tex. Mar. 31, 2023) ...............................................6, 9, 16

*Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*,
123 F.3d 301 (5th Cir. 1997) .............................................................................5, 8, 24

*Eastman Kodak Co. v. Image Tech. Servs., Inc.*,
504 U.S. 451 (1992)..............................................................................................26

*Games People Play, Inc. v. Nike, Inc.*,
2015 WL 13657672 (E.D. Tex. Feb. 13, 2015) ....................................................6

*Glen Holly Ent., Inc. v. Tektronix, Inc.*,
352 F.3d 367 (9th Cir. 2003) ................................................................................8

*Gonzalez v. Kay*,
577 F.3d 600 (5th Cir. 2009) ............................................................................6, 27

*Huffman v. Union Pac. R.R.*,
675 F.3d 412 (5th Cir. 2012) ................................................................................25

*Illumina, Inc. v. FTC*,
    88 F.4th 1036 (5th Cir. 2023) ........................................................................................13

*Knevelbaard Dairies v. Kraft Foods, Inc.*,
    232 F.3d 979 (9th Cir. 2000) ..........................................................................................29

*Koch Agronomic Servs. v. Eco Agro Res. LLC*,
    2015 WL 5712640 (M.D.N.C. Sept. 29, 2015)................................................................19

*Loco Brands, LCC v. Butler Am., LLC*,
    2019 WL 3015046 (E.D. Tex. Jan 28, 2019).....................................................................27

*Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*,
    751 F.3d 368 (5th Cir. 2014) ......................................................................................6, 16

*In re Memorial Hermann Hospital System*,
    464 S.W.3d 686 (Tex. 2015)............................................................................................28

*Miller v. Granados*,
    529 F.2d 393 (5th Cir. 1976) ............................................................................................8

*Multiflex, Inc. v. Samuel Moore & Co.*,
    709 F.2d 980 (5th Cir. 1983) ..........................................................................................12

*MVConnect, LLC v. Recovery Database Network, Inc.*,
    2011 WL 13128799 (N.D. Tex. May 27, 2011) ..........................................................28, 29

*New Orleans Ass'n of Cemetery Tour Guides v. New Orleans Archdiocesan
    Cemeteries*,
    56 F.4th 1026, 1037 (5th Cir. 2023) ................................................................................11

*Nokia Techs. Oy v. HP, Inc*,
    2024 WL 1885683 (D. Del. Apr. 29, 2024)......................................................................11

*Norris v. Hearst Trust*,
    500 F.3d 454 (5th Cir. 2007) ..........................................................................................14

*Novell, Inc. v. Microsoft Corp.*,
    505 F.3d 302 (4th Cir. 2007) ..............................................................................18, 19, 21

*OGD Equipment Co. v. Overhead Door Corp.*,
    2019 WL 5390590 (E.D. Tex. Aug. 7, 2019) ............................................................8, 9, 10

*OrthoAccel Techs. v. Propel Orthodontics*,
    2017 WL 1213629 (E.D. Tex. Apr. 3, 2017)..........................................................11, 15, 25

*Pulse Network, LLC v. Visa, Inc.*,
    30 F.4th 480 (5th Cir. 2022) ................................................................................ *passim*

*Sanger Ins. Agency v. HUB Int'l,*
    802 F.3d 732 (5th Cir. 2015) ........................................................................ *passim*

*Santander Consumer USA v. Ziegler,*
    2017 WL 2729998 (N.D. Tex. June 26, 2017) ........................................................28

*Silicon Servs. v. Applied Materials, Inc.,*
    2007 WL 9701128 (W.D. Tex. Feb. 16, 2007).................................................11, 25

*Steve & Sons, Inc. v. JELD-WEN, Inc.,*
    988 F.3d 690 (4th Cir. 2021) ..................................................................5, 12, 13

*Stone v. FINRA,*
    694 F. Supp. 3d 774 (E.D. Tex. 2023)................................................................28

*Tessera, Inc. v. Micron Tech., Inc.,*
    2005 WL 1661106 (E.D. Tex. July 14, 2005) ...................................10, 12, 13, 20

*Thomas v. Chevron U.S.A., Inc.,*
    832 F.3d 586 (5th Cir. 2016) .........................................................................30

*Tiz, Inc. v. S. Glazers Wine & Spirits, LLC,*
    2024 WL 2785142 (May 30, 2024) ...................................................................27

*TravelPass Grp., LLC v. Caesars Entm't Corp.,*
    2019 WL 5691996 (E.D. Tex. Aug. 29, 2019) .............................................6, 25

*U.S. v. H&R Block, Inc.,*
    833 F. Supp. 2d 36 (D.D.C. 2011) ....................................................................15

*United States v. Microsoft,*
    253 F.3d 34 (D.C. Cir. 2001) .........................................................................17

*ZF Meritor, LLC v. Eaton Corp.,*
    696 F.3d 254 (3d Cir. 2012)..........................................................................14

## INTRODUCTION

*- "Google is clearly buying its way to squelch competitors"*[1]

Google is the most predatory monopolist in decades — and has been adjudicated as such by multiple courts around the country, including as to the core allegations of anticompetitive conduct at issue in this case. Yet Google tells this Court that Branch cannot *state a claim* for relief. Dkt. 25 ("Motion"). Google is as brazen as it is wrong. Branch's 100-page, 374-paragraph Complaint details Google's use of anticompetitive practices, including tying arrangements and exclusivity agreements, to unlawfully restrain trade and maintain its monopoly power in the product markets at issue and target and exclude Branch. Branch is a "direct victim" of Google's anticompetitive conduct. Compl. ¶ 11. Its claims are well-defined and supported by detailed factual allegations that far surpass the *Twombly-Iqbal* pleading standard. Google's contrary arguments are not faithful to the controlling pleading standard, improperly challenge the truth of — and often completely ignore — Branch's factual allegations, and depend on incorrect assertions of law.

Branch developed an innovative search technology, called "Discovery Search," that can be pre-installed by Android mobile device manufacturers ("OEMs") or wireless carriers. Compl. ¶ 10. It enables users to (among other things) search for content across, access reviews on, and download a broad universe of Android mobile applications ("apps") and provides a platform for advertiser content. *Id.* ¶¶ 10, 15, 45-50. Though consumers historically accessed digital content through web-based searches on computers, that behavior has changed: Today, nearly all consumers access digital information on a mobile device, resulting in a major shift from web-based content on computers to app-based content on mobile devices. *Id.* ¶¶ 13-15, 45, 55, 95-97. Discovery Search better aligns with this shift in consumer behavior and demand. *Id.* ¶¶ 15, 45-46.

---

[1] Samsung's internal response to Google requiring Samsung "to kill all search functionalities and products" offered by Branch. Compl. ¶¶ 22-25. All emphasis added unless noted.

1

Before suit, Google *expressly* recognized Branch's competition in multiple respects, including as (1) an alternative or enhancement to web-only searching, threatening to divert mobile device users (and advertisers) away from traditional web-content search to app-content search; (2) a competing technology for the growing demand for app search services, threatening Google Search's app-search functionalities; (3) a competing channel for the discovery and distribution of Android apps, threatening Google's monopoly on Android app distribution, through the Google Play Store; and (4) an alternative outlet for advertisers to follow shifting user demand, threatening Google's search-based and app-store advertising profits. Compl. ¶¶ 16, 47, 66-68.

In response, Google "intentionally and specifically targeted Branch as a rival" and unlawfully excluded it from the Android ecosystem. Compl. ¶ 11. As detailed in the Complaint (*see, e.g.*, *id.* ¶¶ 17-23, 52, 67-68, 92, 120, 173, 177, & Figs. 1-2) and summarized in its Preliminary Statement (*id.* ¶¶ 1-34), Google abused its monopoly power and unlawfully restrained trade through exclusionary agreements with Android manufacturers and distributors to prevent them from integrating Discovery Search. As Branch alleges, quoting recently unsealed Google and third-party documents from the Department of Justice's case against Google, Google was expressly concerned that Discovery Search "created an alternative access point," *id.* ¶ 47, set to become "standard across all of Samsung's devices," *id.* ¶ 27, and was gaining interest and traction from other OEMs and wireless carriers, *id.* ¶ 28. So, Google decided to "stop," "push back on," "discontinue," and "remov[e] this functionality" from all Android devices so that "[G]oogle will own all search on [mobile] device[s]." *Id*. ¶¶ 17-23, 52, 67-68, 92, 120, 173, 177, Figs. 1-2.

As Branch alleged (and the court in the Justice Department's case found), Google targeted Branch specifically by threatening Samsung and others with the loss of their billions in revenue share, Compl. ¶ 20, and by expressly amending Google's exclusionary revenue-sharing contracts

with Samsung (and other Android distributors) to expand the definition of prohibited "Alternative Search Services" to exclude Branch Discovery from each new mobile device as "web or on-device search . . . that offers functionality similar to Google search." Compl. ¶¶ 18-19, 30, 170-176. Even Samsung recognized that Google was "afraid" that Discovery Search would "cannibalize Google's main business" (search), and thus Google "was attempting to kill all of Branch's attempts." *Id.* ¶¶ 22, 90. Despite acknowledging Google was "buying its way to squelch competitors," Samsung had "to accept these terms" regarding Branch because, "[o]utside of a potential antitrust action, I don't see Samsung being able to refuse the money." *Id.* ¶¶ 22-24; *see id.* ¶ 177 (similar, as to AT&T). Google then moved up and across the Android distribution chain and barred Discovery Search from being pre-installed by "*all* of the major OEMs and wireless carriers." *Id.* ¶¶ 26-31.

Tellingly, Google's Motion does not address *any* of Branch's allegations about Google's restrictive agreements and their widespread anticompetitive effects. Instead, Google paints a misleading factual picture that Google and Branch do not compete in the same technology markets and claims Branch does not have standing to challenge Google's anticompetitive schemes. Of course, this raises the question: If Branch was not a competitive threat to Google, as Google claims now, then why did Google specifically and intentionally target Branch and foreclose it from getting distribution with OEMs and carriers? The answer is exactly as Branch alleged: Google, *in fact*, recognized Discovery Search as offering a "*functionality similar to Google Search*" (and other Google products) and abused its monopoly power to amend agreements with OEMs and carriers to prevent Discovery Search's integration on Android devices. Compl. ¶¶ 11, 18, 86, 91, 171-76.

None of the Motion's arguments have merit. *First*, Google claims Branch lacks antitrust standing. But the Motion ignores the well-pleaded allegations, disputes others, goes outside the Complaint, and never addresses Branch's multiple, sufficient grounds for antitrust standing.

3

Google's principal argument is that Branch and Google allegedly are not competitors, but that is not the relevant question for multiple reasons. For one, the Motion *never* addresses Branch's standing on its claims under Section 1 of the Sherman Act and the parallel state antitrust law claims (Counts 1-3, 10-11, 13-14). That omission is dispositive on those claims because, as to each, Branch expressly alleged it was injured (among other reasons) by being excluded from the Android app search services market. *See, e.g.*, Compl., ¶¶ 246, 260, 270, 325, 334, 351-52, 360. And Google *admits* "that Branch felt effects in its alleged market (Android app search)," Mot. at 15, and only disputes (incorrectly) that "*Google* competes in this bespoke alleged market that Branch appears to tailor to its own product," *id.* at 12. But whether a jury ultimately determines that Google also competes in that Android app search services market has no bearing on Branch's exclusion from and thus ability to show its own antitrust injury in that market.

In any event, as to standing on Branch's monopolization claims that the Motion does directly challenge, "[c]ompetitor status is not required to establish [antitrust] standing." *Am. Cent. E. Tex. Gas Co. v. Union Pac. Res. Grp., Inc.*, 93 F. App'x 1, 7 (5th Cir. 2004). Rather, the relevant question is whether Branch has alleged that "its asserted injury reflects an anticompetitive aspect of the defendant's conduct." *Pulse Network, LLC v. Visa, Inc.*, 30 F.4th 480, 488 (5th Cir. 2022). The Complaint *sails over* that standard. Branch alleged in detail how Google abused its monopoly power to foreclose Discovery Search from getting distribution through integration of its search technology with Android OEMs and carriers, a "textbook antitrust injury." *Id.* at 492. And Branch was "injured precisely by the anticompetitive aspects" of Google's conduct — the exclusionary agreements that prevented distributors from installing Discovery Search (or other non-Google technology) on Androids. *Id*.

Google's express targeting of Branch as a rival makes the antitrust injury question even

4

easier to resolve in Branch's favor. *See, e.g.*, *Sanger Ins. Agency v. HUB Int'l*, 802 F.3d 732, 737-41 (5th Cir. 2015) (standing where defendant "aimed its efforts at [Plaintiff] after expressing its concern about the competitive threat the company posed"); *Steve & Sons, Inc. v. JELD-WEN, Inc*., 988 F.3d 690, 711 (4th Cir. 2021) (similar). After all, "standing should not become the tail wagging the dog in 'classical' antitrust cases such as this one by an allegedly excluded competitor." *Doctor's Hosp. of Jefferson, Inc. v. Se. Med. All., Inc.*, 123 F.3d 301, 306 (5th Cir. 1997).

*Second*, Google's separate claim that Branch has not stated viable tying claims is based on a procedurally improper and factually incorrect challenge to Branch's definition of the Android app search services market. Google's claim that Branch failed to plead anticompetitive effects in this tied product market is belied by even a quick scan of the Complaint. *See* Compl. ¶¶ 7-8, 16-17, 21-22, 26-32, 51-52, 142-53, 158-60, 219-32, 258, 263, 273.

*Third*, Google's challenge to Branch's tortious interference claims also misleadingly cherry-picks a tiny fraction of Branch's allegations. Branch specifically identified business relationships with major OEMs and carriers (including Samsung, Motorola, AT&T, Sprint, T-Mobile, and Verizon) that Google "intentionally scuttled." Compl. ¶¶ 17, 21-23, 29, 89-91, 120, 170-74, 177, 369-70. And Branch alleged exactly how Google interfered, including by amending its exclusionary contracts with those firms to "carve out" Discovery Search, which led to Samsung and others terminating, or refusing to enter, business relationships with Branch. *Id*. ¶¶ 17, 19, 21, 26-31, 41, 67, 89-92, 120, 167-74, 369, Figs. 1-2. That is more than adequate at this stage.

*Finally*, Google's cursory challenge to Branch's state law antitrust claims should be rejected because it is predicated entirely on Google's legally insufficient arguments as to Branch's federal antitrust claims. Plus, Branch adequately alleged antitrust standing on its state law claims, and Google's state law arguments are wrong on the law. The Motion should be denied.

## LEGAL STANDARD

On a Rule 12(b)(6) motion, Branch's allegations must be accepted as true and viewed in the light most favorable to Branch, and Google must show that the Complaint lacks facial plausibility to draw a reasonable inference that Google is liable for the misconduct alleged. *Gonzalez v. Kay*, 577 F.3d 600, 603 (5th Cir. 2009). "It is not a procedure for resolving contests about the facts or the merits of a case." *Games People Play, Inc. v. Nike, Inc.*, 2015 WL 13657672, at *2 (E.D. Tex. Feb. 13, 2015).

"Antitrust claims do not necessitate a higher pleading standard." *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 751 F.3d 368, 373 (5th Cir. 2014). And because antitrust standing "is often a fact-intensive inquiry that requires discovery," it "is not typically resolved through motions to dismiss." *Dexon Comp. v. Cisco Sys.*, 2023 WL 2730656, at *27 (E.D. Tex. Mar. 31, 2023); *TravelPass Grp., LLC v. Caesars Entm't Corp.*, 2019 WL 5691996, at *22 n.25 (E.D. Tex. Aug. 29, 2019), *adopting R&R*, 2019 WL 4727425 (E.D. Tex. Sept. 27, 2019) (same).

## ARGUMENT

### I.    BRANCH PLAUSIBLY ALLEGED ANTITRUST STANDING

There are three elements for antitrust standing: "1) injury-in-fact, an injury to the plaintiff proximately caused by the defendants' conduct; 2) antitrust injury; and 3) proper plaintiff status, which assures that other parties are not better situated to bring suit." *Sanger*, 802 F.3d at 737. Google does not challenge injury-in-fact. It primarily challenges antitrust injury, though it also includes stray argument on proper plaintiff status. To allege antitrust injury, Branch must allege that "its asserted injury reflects an anticompetitive aspect of the defendant's conduct." *Pulse Network*, 30 F.4th at 488 (quotations omitted). Branch more than satisfied that standard.

Google's standing challenge starts from the mistaken premise that Branch's "sole theory of standing" is that, for each of the four markets in which Branch alleges injury, Google and Branch

are competitors. To be sure, in-market competition is *one* of Branch's standing theories, and Google's competitor arguments are wrong and premature. *Dexon*, 2023 WL 2730656, at *27 (denying motion to dismiss as to antitrust injury because "a plaintiff's contentions regarding a transaction's effect on competition is often a fact-intensive inquiry that requires discovery").

But, as the Motion acknowledges (at 7), "Competitor status is not required to establish [antitrust] standing." *Am. Cent.*, 93 F. App'x at 7; *Am. Ad. Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1057 (9th Cir. 1999). Branch has standing under four independent standing theories, any one of which suffices: (1) Branch is a competitor, or at least a nascent competitor, to Google in multiple relevant markets; (2) Branch has been directly targeted and harmed by Google's anticompetitive conduct; (3) Google's anticompetitive conduct had the intention and effect of thwarting Branch's ability to lower barriers to entry; and (4) Branch's injuries are inextricably intertwined with and were an integral aspect of Google's anticompetitive conduct. The Motion erroneously ignores all but the first ground for standing.

### A.    Branch Has Antitrust Standing in the Android App Search Services Market

The first market in which Branch suffered antitrust injury is the Android app search services market. That market encompasses services that "allow consumers to find responsive information in mobile applications by entering keyword queries in an application search service" on Android operating systems. Compl. ¶ 54. Branch adequately alleged antitrust injury in this market as an in-market competitor to Google and as a direct target of its anticompetitive conduct.

***In-Market Competitor***. Google admits that Branch competes and "felt effects" in this market. Mot. at 15. So, to challenge standing as to this market, Google claims that Branch improperly defined it to include *Google*. *Id*. at 13-14. That argument is wrong on multiple levels.

*First*, Google's argument is legally irrelevant to Branch's Counts 1-3, 10-11, and 13-14 for violations of Section 1 of the Sherman Act (and state law equivalents). For Counts 1, 10, and 13,

7

Branch alleged that Google entered unlawful agreements with Android distributors that foreclosed competing search technologies, including Discovery Search. Compl. ¶¶ 243-54. Google does not dispute that Branch competes in the Android app search services market, and was excluded from that market by Google's anticompetitive conduct. Mot. at 15. That injury falls "easily within the conceptual bounds of antitrust injury, whatever the ultimate merits of its case," *Doctor's Hosp.*, 123 F.3d at 305, because "an excluded competitor . . . suffers a distinct injury if it is prevented from selling its product." *Pulse*, 30 F.4th at 491 (quoting *Andrx Pharm., Inc. v. Biovail Corp.*, 256 F.3d 799, 816-17 (D.C. Cir. 2001)).[2]

Likewise, for Counts 2-3, 11, and 14, Branch's tying claims, Branch need only allege antitrust injury in the *tied* product market. *Miller v. Granados*, 529 F.2d 393, 397-98 (5th Cir. 1976) (tying "den[ies] competitors free access to the market for the tied product"). Here, Branch alleges that Google unlawfully restrained trade in *at least* the Android app search services market by excluding Discovery Search (and all other non-Google technology), Compl. ¶¶ 246, 260, 270, 325, 334, 351-52, 360, and that Branch competes in that market, *id*. ¶¶ 7, 16, 22, 32-33, 47, 58, 63, 66-70, 170-77, 220-23. That injury — being "squeezed out of the market because [Google] exploits its dominance," *Pulse*, 30 F.4th at 491, to prevent distributors from installing Branch — plainly constitutes antitrust injury because it is the direct result of the "anticompetitive aspect of defendant's conduct," *id.* at 488. In short, the Motion does not *even address* the applicable law and allegations as to Counts 1-3, 10-11, and 13-14, and necessarily fails as to those claims.

*Second*, even as to Branch's Section 2 claims for monopolization and attempted monopolization in this market (Counts 4 and 5), Google's argument is not appropriate for a Rule

---

[2] *Accord Glen Holly Ent., Inc. v. Tektronix, Inc.*, 352 F.3d 367, 377-78 (9th Cir. 2003) (finding antitrust injury "where the plaintiff has alleged an unlawful agreement, dressed up as a competitor collaboration, to kill off a product in order to end competition").

12(b)(6) motion. A defendant's argument that an alleged market "is not in fact the relevant market" is "a fact-intensive inquiry and therefore a matter for summary judgment." *OGD Equipment Co. v. Overhead Door Corp.*, 2019 WL 5390590, *3 (E.D. Tex. Aug. 7, 2019), *adopting R&R*, 2019 WL 4253939 (E.D. Tex. Sept. 8, 2019). Courts do not "look behind allegations at the pleading stage to explore facts concerning the market definition." *Id.* at *3. "Indeed, in assessing whether a plaintiff has adequately alleged an antitrust injury, the Court must assume that an antitrust violation has occurred." *Dexon*, 2023 WL 2730656, at *27. This too is dispositive at this stage.

*Third*, Google is wrong on the facts. The Complaint includes detailed allegations defining this market, including: the unique consumer demand for app search services (Compl. ¶¶ 55-56); why other products, such as books, publisher websites, social media platforms, and specialized search providers, are not reasonable substitutes for app search services (*id.* ¶ 57); why search engines "like Google Search" that provide in-app content "compete in the Android application search services market" *(id.* ¶¶ 54, 58, 60); and the market's geographic scope (*id.* ¶¶ 61-62).

Google is also wrong that Branch did not adequately allege that users demand in-app search technology. Mot. at 13. Branch alleged not only that users "demand" app-based content, but that such content is "*essential*" as users have shifted from searching "on the web" to searching apps on their mobile devices. Compl. ¶¶ 13-15 (mobile device users on average access their devices 80 times per day, and 79 of those are to access content through apps), 14-16, 45, 55, 123-124 (app search services are "more seamless, faster, easier, and more personalized, with user preferences and information automatically accessible and instantly loaded"). Branch even quoted Google's own research on consumer demand for app content. *Id.* ¶¶ 12, 55. And Branch created Discovery Search in part *because* it "better aligns with consumer behavior and demand." *Id.* ¶ 15.

Similarly, Google is wrong that Branch did not adequately allege that Google competes in

this market. Branch expressly and repeatedly did so. Branch alleged "Google's own products that search and return results of deep-linked apps and app content across multiple verticals in response to user queries – *such as Google Search*" compete in the Android app search services market. Compl. ¶ 65; *see id.* ¶¶ 7, 16, 22, 32-33, 47, 58, 63, 66-70, 170-77, 220-23. That is because Google Search, among other things, "provide[s] Android in-application content in response to search queries" and "can crawl through your app content and present your Android app as a destination to users through Google results." *Id.* ¶ 58 (cleaned up). In fact, "after members of the Google corporate development and mobile search teams met with Branch executives in 2015, Google subsequently re-configured Google Search and its related product offerings to directly compete with Discovery Search's technology by also providing developers and advertisers the options of sending Google Search users either to in-app content or to their websites." *Id.* ¶ 87. Google's claim that such content must "correspond[] to a web page" for the app developer, Mot. at 13, is an improper factual dispute about market definition. *See OGD Equipment Co.*, 2019 WL 5390590, *3. It is also irrelevant. Nothing in the market definition (Compl. ¶ 54) contains that limit.

Google's internal documents also *expressly* "recognized Discovery Search as a competitor for a '*search experience across multiple apps through deep linking*,'" as evidenced by Google responding with a "[G]oogle solution." Compl. ¶¶ 47, 67. In fact, in communications with OEMs like Samsung, whose employees reported that Google was trying to "kill" Branch's app-search features, *id.* ¶ 68, Google specifically touted Google Search's app search functionality. *Id.* ¶ 33.

These detailed allegations render inapposite the portion of *Tessera, Inc. v. Micron Tech., Inc.*, 2005 WL 1661106 (E.D. Tex. July 14, 2005) on which Google relies. *See* Mot. at 14. There, the plaintiff claimed semiconductor *packages* are "substitutes for the other components required to manufacture a [semiconductor] chip." *Id.* at *3. Here, Branch, Google, and OEMs viewed

Google Search and Discovery Search as *competing in the same market — i.e.*, competing services that "allow consumers to find responsive information in mobile applications." Compl. ¶ 54.

There is also no merit to Google's suggestion that Branch must *prove* interchangeability and cross-elasticity on the pleadings. Mot. at 14. "[I]nterchangeability merely implies that one product is roughly equivalent to another for the use to which it is put." *OrthoAccel Techs. v. Propel Orthodontics*, 2017 WL 1213629, at *4 (E.D. Tex. Apr. 3, 2017). Branch alleged that Google Search and Discovery Search are "reasonably interchangeable" in the Android app search services market because, among other features, both allow consumers to find responsive information in mobile apps by entering keyword queries. *Id.* No more is required at this stage. Whether the products are *in fact* interchangeable "is precisely the type of factual dispute that the parties will develop and resolve as the case progresses," and for which Branch is "entitled to discovery." *Silicon Servs. v. Applied Materials, Inc.*, 2007 WL 9701128, at *4 (W.D. Tex. Feb. 16, 2007).[3]

Google's other cases are similarly inapposite. In *New Orleans Ass'n of Cemetery Tour Guides v. New Orleans Archdiocesan Cemeteries*, the plaintiff failed to plausibly define a product market for cemetery tours because it did not account for whether "other New Orleans historical site tours are reasonably interchangeable substitutes for cemetery tours." 56 F.4th 1026, 1037 (5th Cir. 2023). And in *Nokia Techs. Oy v. HP, Inc.*, the plaintiff "pled a relevant technology market" but failed to "make clear" which market(s) were at stake by "confusing[ly] refer[ing] to the Relevant Markets but only offer[ing] a definition for the Relevant Market." 2024 WL 1885683, at *4 (D. Del. Apr. 29, 2024). Neither applies here: Branch identified substitutes in this market,

---

[3] Google cites *Bell v. Dow Chem Co.*, 847 F.2d 1179, 1184 (5th Cir. 1979), but that case was decided on summary judgment, not Rule 12(b)(6), with the court considering fact and expert testimony, documents, and other evidence. *Id.* And the crux of that ruling was that the plaintiff's expert improperly calculated market share in the asserted market and, when excluded, resulted in no "issue of material fact on market share." *Id.* That holding has no bearing on any issue here.

Compl. ¶¶ 54, 58, 60; identified services that are not interchangeable and excluded from the market, *id*. ¶¶ 57, 59; and identified relevant geographic limitations, *id*. ¶¶ 61-62.

*Direct Target*. Even without Branch's well-pleaded allegations that Branch and Google compete in the Android app search services market, Branch has standing to sue in this market. That is because antitrust injury exists where the plaintiff is the direct target of the defendant's anticompetitive conduct, regardless of in-market competitor status. *See supra*, at 4-5.

Google's own case, *Tessera*, demonstrates the point. In *Tessera*, the parties indisputably operated in different markets: the plaintiff licensed computer chip "packaging technology," while the defendants manufactured computer chips. *See* Mot. at 15. Those products were "not reasonably interchangeable" and were "not substitutes." 2005 WL 1661106, at *3. But in a portion of *Tessera* that Google omits, the court held that the plaintiff *nonetheless had standing* because "it ha[d] alleged that it was a target of the alleged conspiracy in the chip market" because "the aim of Defendants' conspiracy was to boycott its product and put it out of business." *Id.* at *4. That direct targeting also meant the plaintiff's injuries "were directly related to Defendant[s]' conspiracy and [] its recovery w[ould] not be duplicative or create complexity in apportioning damages." *Id.*[4]

Branch's allegations of direct targeting far exceed the *Twombly-Iqbal* standard. "Google intentionally and specifically targeted Branch as a rival — a recognized competitive threat in multiple markets." Compl. ¶ 11; *see id*. ¶¶ 66, 215. In its own words, Google worked to "stop the functionality" of Discovery Search, was "pushing back" against Branch by using restrictive contracts with distributors, and was seen by Samsung as "attempting to kill all of Branch's attempts" to compete with Google. *Id.* ¶¶ 7, 11, 17-33, 52, 67, 69, 120, 173, 220-25.

---

[4] *See also, e.g.*, *Sanger*, 802 F.3d at 737-41 (antitrust injury where defendant "aimed its efforts" at plaintiff after assessing "the competitive threat [it] posed"); *Steve & Sons*, 988 F.3d at 711 (same); *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1103 (9th Cir. 1999) (similar).

In short, "[t]his is the stuff of which antitrust cases are made" because Google "clearly was trying to maintain its market dominance and exclude any and all competitors." *Multiflex, Inc. v. Samuel Moore & Co.*, 709 F.2d 980, 994–95 (5th Cir. 1983); *Pulse*, 30 F.4th at 491.

## B.    Branch Has Antitrust Standing in the General Search Services Market

Branch also has antitrust standing for its Section 2 monopolization claim (Count 6) and Section 1 claims (Counts 1-3) in the general search services market. Google does not dispute that this is a proper market or that Google is a monopolist in this market. Compl. ¶¶ 75-84 (quoting *Google*, 747 F. Supp. 3d at 117-23 (finding "[g]eneral search services is a relevant product market" and "Google is a monopolist" in this market)). Instead, Google argues that Discovery Search "is not a general search engine" and thus "does not compete" in this market. Mot. at 13.

But again, Branch does not need to be a "general search engine" to have antitrust injury in this market — an assertion that other courts have expressly rejected. *See Lucasys*, 576 F. Supp. 3d at 1344 (no authority "*even suggesting*" that "an antitrust plaintiff must have a complete substitute product to have antitrust standing"); *Am. Cent.*, 93 F. App'x at 7 (rejecting standing challenge predicated on whether plaintiff offers the same product as the defendant because plaintiff's product "adds to the market"). Rather, antitrust analysis must reflect "market realities," *Pulse*, 30 F.4th at 493, and "courts should combine different products or services into a single market when necessary to reflect these realities," *Illumina, Inc. v. FTC*, 88 F.4th 1036, 1049 (5th Cir. 2023).

***Direct Target***. Here, the "market realities" are that Google specifically targeted Branch as a competitive threat to Google Search and thus Branch has antitrust standing to challenge Google's monopolization of the general search services market. *See Tessera*, 2005 WL 1661106 at *4; *Sanger*, 802 F.3d at 737-41; *Steve & Sons*, 988 F.3d at 711; *Big Bear Lodging Ass'n*, 182 F.3d at 1103. Google "specifically endeavored to prevent Branch from getting distribution" to avoid the "competitive pressure" it posed on the general search business. Compl. ¶ 74. Branch's customers

and would-be customers recognized this: Samsung, for example, understood the "Google-Samsung contract terms" that exclude "anything that can be claimed by Google as 'web search'" were a "gating factor" to Samsung's installation of Discovery Search. *Id.* ¶ 90; *see id.* ¶¶ 89, 91-92, 164-78 (similar as to AT&T and T-Mobile). Samsung also understood that Google singled out Branch precisely because it was "afraid" that Discovery Search would "cannibalize Google's main business," *i.e.*, Google Search. *Id.* ¶¶ 22, 90. Google's *factual* argument now that Discovery Search had "zero impact on Google search traffic" (Mot. at 9) ignores Branch's allegations that the "limited" integration and impact of Discovery Search was a direct consequence of, and the express goal of, Google's exclusionary conduct. Compl. ¶¶ 69, 85-89, 121; *see ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 289 (3d Cir. 2012) ("A jury could certainly conclude that Plaintiffs' inability to grow was a direct result of [defendant's] exclusionary conduct.").

**In-Market or Nascent Competitor**. Branch also adequately alleged both that Discovery Search competes with Google in the general search services market, and that Google perceived Discovery Search as a competitive threat in this market. *See* Compl. ¶¶ 10, 13-19, 22, 45-48, 50, 56, 66-67, 74, 85-86, 88-90, 92-100, 152, 170-78, 182-83, 215, 220-23, Figs. 1-6 & 8.[5] Mobile device users spend over 90% of their internet time in mobile apps, *id.* ¶¶ 13-15, 45, 55, 95-97, and use apps to perform informational and commercial queries previously conducted on the web, *id.* ¶¶ 13, 56, 93. Discovery Search capitalizes on this reality by providing "an alternative and enhancement to web-only searching" that "threatens to divert mobile device users (and advertisers) away from traditional web-based search." *Id.* ¶¶ 16-17; *see id.* ¶¶ 10, 14-15, 45-48, 55-56, 74, 85-

---

[5] This makes Google's reliance (Mot. at 10) on *Norris v. Hearst Tru*st, 500 F.3d 454, 457 (5th Cir. 2007), entirely misplaced: Plaintiffs there were *distributors* of the *Houston Chronicle,* a newspaper owned by defendant, and their only claimed injury was that the defendant "wrongfully cancelled their distributor contracts in retaliation for 'blowing the whistle' on" allegedly anticompetitive conduct. *Id.* 466-67. Plaintiffs were not, and did not claim to be, defendant's competitors.

100. And like Google Search, Discovery Search can be preinstalled on mobile devices; provides an integrated search bar "into which users can input search queries" and a "one stop shop" to a large and diverse volume of information; and can return results across deep-linked, indexed content both from mobile apps and websites. *Id.*[6] Discovery Search thus "allow[s] consumers to find responsive information on the internet by entering keyword queries." *Id*. ¶ 71.

Contrary to Google's arguments now, the Complaint makes clear that Google in fact recognized Discovery Search as a competitor, or at least a significant competitive threat, in the general search services market. This is demonstrated by Google's internal communications and exclusionary contracts. *See U.S. v. H&R Block, Inc*., 833 F. Supp. 2d 36, 52 (D.D.C. 2011) ("When determining the relevant product market, courts often pay close attention to the defendants' ordinary course of business documents."). As Google employees put it when they set out to "kill" Branch, Google considered Discovery Search to offer *"functionality similar to Google Search*" because it provides "an alternative search access point" that "expands the search experience," rendering it a direct threat to Google Search. Compl. ¶¶ 18-19, 22, 46-48, 74, 85-100, 170-78, 182-83, Figs. 1-3 & 8. In fact, Google "killed" Discovery Search using the *same* contractual provisions Google used to injure and preclude the distribution of general search engines, like Microsoft Bing. Compl. ¶ 86, 170-77; *accord Blue Shield of Virginia v. McCready*, 457 U.S. 465, 484 (1982). And Google specifically amended those contracts to also exclude *Branch* as a prohibited "Alternative Search Service." Compl. ¶ 175. Even Samsung recognized that Google was "afraid" that Discovery Search would "cannibalize" Google Seach business, *id.* ¶ 22.

Based on these well-pleaded facts, Branch plausibly alleged Discovery Search is

---

[6] Contrary to Google's improper factual argument, Discovery Search *was designed to provide* the option of routing users to website content (in direct competition to Google Search). Compl. ¶ 87.

"reasonably interchangeable" with, or at least presented serious "competitive pressures" on, Google Search in the general search services market. *OrthoAccel Techs.*, 2017 WL 1213629, at *4 (products need not be "perfectly fungible"); *Lucasys*, 576 F. Supp. 3d at 1344 (imperfect substitutes create competitive pressures and give rise to antitrust injury).[7] Google's merits disputes about competition are for the jury, *not* a Rule 12(b)(6) motion. *Dexon*, 2023 WL 2730656, at *27.

But even if the ultimate fact finder does not view Discovery Search as currently reasonably interchangeable with Google Search, Branch still would have standing as a "nascent" competitor in the general search services market. Under Fifth Circuit law, "a plaintiff who never entered a particular market but would have if not for an antitrust violation can undoubtedly challenge an antitrust violation in court." *Sanger*, 802 F.3d at 737. "In fact," *Sanger* explained, "such firms may be prime targets for antitrust violations, because 'early exclusion may be far cheaper than ruining or disciplining a recent entrant who has become established.'" *Id.* A plaintiff may establish antitrust injury as a nascent competitor by alleging: "(1) an intention to enter the business, and (2) a showing of preparedness to enter the business." *Id.* at 738 (quotations omitted).

The facts and reasoning of *Lucasys*, 576 F. Supp. 3d at 1344, which applied *Sanger*, are instructive. There, an upstart software developer brought monopolization claims related to a "primary" software market in which the plaintiff did not yet sell a substitute product. *Id.* But the plaintiff properly alleged that its software "fills in gaps" where the defendant's product was deficient, and that but for the anticompetitive conduct, it "will be able to begin competing more

---

[7] These allegations also make *Waggoner v. Denbury Onshore, L.L.C.* (Mot. at 10) inapposite. The plaintiff there owned an interest in a carbon dioxide well and challenged his royalties due to a "civil conspiracy alleging that [defendant] sells the carbon dioxide" at low prices to its subsidiaries. 612 F. App'x 734, 738 (5th Cir. 2015). The court held, based on precedent addressing the exact same issue, that "Waggoner's decrease in royalties" is not antitrust injury because it "*is the result of downstream conduct by the payor, in a market in which Waggoner is not a participant.*" *Id*. Branch *is* a "participant" in the general search services market and was directly targeted in it.

broadly with [the defendant] in the [primary market] . . . and eventually create a replacement for" the defendant's product. *Id.*; *see also id.* at 1345 n.3 (plaintiff alleged that competition in the secondary market is "the most likely route for a potential competitor in the [primary market] to achieve sufficient scale to threaten [defendant's] monopoly"). The plaintiff also alleged the requisite background, financing, and track record to enter the primary market. *Id.* at 1346. Applying the Fifth Circuit's *Sanger* test, the *Lucasys* court concluded the plaintiff had adequately alleged antitrust injury as a nascent competitor and denied the defendant's motion to dismiss. *Id.*[8]

Here, as in *Sanger* and *Lucasys*, Branch alleged its intent and ability to enter the general search services market. Branch alleged an intent to enter the market, Compl. ¶¶ 6, 10, 14-18, 45-47, 74; preparedness to do so, as evidenced by Branch's configuration offering web content, *id*. ¶¶ 17, 87; the demand for Discovery Search from OEMs and carriers who had been using Google Search and Branch's ability to succeed in limited integrations, *id*. ¶¶ 17, 27-30, 69-70, 87, 89-92, 120-22, 173, 177, 368-69; Branch's ability to attract investment and funding, technology partners, and app developer customers, *id*. ¶¶ 42, 70, 98, 122; and its ability to build out its search infrastructure, *id*. ¶¶ 14-15, 45, 55-56, 79-80. Thus, a "factfinder could conclude that [Branch] was prepared to enter" the market "[a]bsent the exclusive dealing arrangement that [Branch] contends prevented it" from doing so. *Sanger*, 802 F.3d at 740. Again, Google's factual disputes on this point are for the jury.

On that point, Google also argues that, following a lengthy *trial*, the court in the DOJ case found that Branch was not a competitor (or nascent competitor) in the general search engine market. *See* Mot. at 9. But that provides no basis to dismiss here. Branch's antitrust standing was

---

[8] *Accord United States v. Microsoft*, 253 F.3d 34 (D.C. Cir. 2001) (recognizing outside the standing context that nascent competitors must be assessed not as current substitutes but as "potential" "threats," especially in markets with "rapid technological advance and frequent paradigm shifts").

not at issue (and thus not decided) in that case because private antitrust standing is not an element of a government antitrust action. That case instead concerned whether the court could infer causation in the government's monopolization case, and although the court declined to take that shortcut, it ultimately found Google's conduct was unlawful, had anticompetitive effects, and was without procompetitive justification. In any event, Branch also was not a party to that case (and thus cannot be bound by any of it), so the court there did not have Branch's detailed allegations relating to the relevant markets before it (nor were any Section 1 claims at issue there). And even without those allegations, that court still found that Google's conduct was directed specifically at Branch, whose relationships were "chill[ed]" by Google (findings which, by contrast, *are* binding on Google). *See Google*, 747 F. Supp. 3d at 170. This Court has Branch's allegations before it, and they demonstrate not only that Branch is a competitor or nascent competitor in the general search services market, but also that Branch has standing in (1) that market for multiple other reasons, and (2) other markets not at issue in the DOJ case, either.

***Lowering Barriers to Entry***. Branch also has standing in the general search services market because it offered a product that, but for Google's anticompetitive scheme, would have lowered the barriers to entry for other competitors. In *Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302 (4th Cir. 2007), a software developer (Novell) brought antitrust claims against Microsoft predicated on injury to competition in the market for PC operating systems, a market in which the plaintiff-developer did not compete. *Id.* at 307, 316. The court held that the developer adequately alleged antitrust injury because the injury it sustained "allegedly had the effect of thwarting the ability of Novell's products to lower the applications barrier to entry into the [PC] operating-system market, therefore harming competition in that market." *Id.* at 316. Novell's products, the court explained, were designed to function across multiple operating systems; thus, by harming them, Microsoft

inhibited potential competitors from "gain[ing] a foothold in the operating-systems market." *Id.* at 318. That injury, which kept "the barriers to entry into that market high," was "plainly an injury to *competition* that the anti-trust laws were intended to forestall." *Id.* at 316.[9]

As in *Novell* and *Koch*, Branch more than plausibly alleged that Google's anticompetitive conduct reduced Branch's ability to lower entry barriers into the general search services market and prevented effective competition. *See* Compl. ¶¶ 97-100, 182-83, 227-32. Google's motion does not address any of these allegations. Google does not contest that it maintains its monopoly over this market by preventing its rivals "from getting the scale necessary to effectively compete with Google," which is "essential for building, improving, and sustaining a general search engine." *Id*. ¶ 229; *see also id*. ¶¶ 98-100, 227-32. Nor does Google dispute that, but for its unlawful conduct, Discovery Search would "divert Google search traffic and impair Google Search advertising revenues, each of which otherwise helps Google maintain its illegal monopoly and thwarts entry and competition from other search technologies." *Id*. ¶ 99; *see id*. ¶¶ 227-32. Google also ignores entirely that Discovery Search would lessen the need for pre-installation of Google's suite of apps, enabling firms to renegotiate the exclusionary contracts that preclude entry of Google's search competitors and reinforce Google's scale. *Id*. ¶¶ 77-84, 97-100, 182-83, 227-32.

These allegations distinguish *Fotobom*, 719 F. Supp. 3d at 47, on which Google selectively relies. Mot. at 9. That plaintiff did not "allege[] that greater use of [its product] will do anything to enhance competition in the general search services market," 719 F. Supp. 3d at 47. Here, Branch alleged exactly how Discovery Search would enhance competition, including based on Google's own recognition of such competition's effects. Compl. ¶¶ 16, 97-100, 182-83, 227-32. *Greenlight*

---

[9] *See also Koch Agronomic Servs. v. Eco Agro Res. LLC*, 2015 WL 5712640, at *11 (M.D.N.C. Sept. 29, 2015) (anticompetitive conduct that "thwarted the ability of [the] products to compete" and "possibly lower the barrier to entry" is "sufficiently pled antitrust injury").

*Venture Corp. v. Google LLC* is also inapposite, because that plaintiff "concede[d] that it is not a market participant in the general search services market" and did not allege it would have enhanced competition among general search engines. 2024 WL 4723121, at *2-3 (S.D. Fla. Nov. 8, 2024).

### C.    Branch Has Antitrust Standing in the Android App Distribution Market

The third market in which Branch has standing is the Android app distribution market. That is the market "in which consumers may obtain apps for use on Android mobile devices that meet their specific needs and preferences." Compl. ¶ 101. Branch adequately alleged antitrust injury as a competitor or nascent competitor in this market; as a direct target of Google's anticompetitive conduct in this market; and as a party that lowers barriers to entry into this market.

***In-Market or Nascent Competitor***. Google argues that (1) this market should be redefined from Android app distribution to the more limited "app stores"; (2) Branch is not an "app store"; and hence (3) Branch "does not compete" in this market. Mot. at 11-12. Each assertion is wrong.

To start, Branch defined the market as the market "in which consumers may obtain apps for use on Android mobile devices that meet their specific needs and preferences," which "includes all channels by which Android apps on mobile devices may be distributed to consumers," including as relevant here, "through direct downloading of apps by consumers without using an app store." Compl. ¶ 101; Mot. at 5 (same). Although Google may argue at trial that the relevant market is narrower, a Rule 12(b)(6) motion cannot redefine this market to "app stores." Branch's definition, not Google's, controls and is granted "wide deference." *Tessera*, 2005 WL 1661106, at *2.

And Branch plausibly alleged that Discovery Search competes in this Android app distribution market. Compl. ¶¶ 117-30. It provides a platform through which "consumers may search for, discover, and obtain apps for use on Android mobile devices and enables customers to search for, access reviews on, purchase, download, and install mobile apps using the mobile device and an internet connection." *Id*. ¶¶ 16, 46, 50, 117-30, Figs. 4-6. At a minimum, moreover, Branch

20

adequately alleged it is a nascent competitor in this market, both based on its intent to compete and demonstrated preparedness to do so. *E.g.*, *id.* ¶¶ 122-24; *see Sanger*, 802 F.3d at 738; *supra*, at 14-17. This is nothing like *Ambilu Tech. AS v. U.S. Composite Pipe S.*, where the plaintiff never alleged the defendant "*was ever its competitor.*" 2024 WL 993284, at *6 (M.D. La. Mar. 7, 2024).

Google's sole rebuttal is the procedurally improper, factually incorrect, and internally inconsistent claim that Discovery Search is not a tool "for downloading apps." Mot. at 12. That contradicts the Complaint. *E.g.*, Compl. ¶ 222 ("With Discovery Search, apps could be directly downloaded and installed . . . .), Figs. 4 & 6 (depicting a direct "install" option through Discovery Search); *see also id.* ¶¶ 46, 50, 100, 117-18, 122-23, 128-29). In fact, even the Motion admits Discovery Search enables users to "to find apps and then download those apps." Mot. at 12.

*Direct Target*. Google also fails to address Branch's direct targeting allegations. Google targeted Branch as a competitive threat to Google in the Android app distribution market and explicitly sought to exclude Branch to protect its Google Play Store monopoly. Compl. ¶¶ 118-24 & Figs. 5-6. That is because Google recognized that Discovery Search users could "search across multiple apps" and deliver "results" from individual apps and other app stores, such as the Galaxy Store (thus facilitating competition with the Google Play Store). *Id.* ¶ 119 & Fig. 5. Samsung, too, noted that Google was "attempting to kill all of Branch's attempts" to make inroads in the market, including "app install suggestions." *Id.* ¶ 120. This too suffices. *See supra*, at 4-5, 12-13.

*Lowering Barriers to Entry*. For similar reasons, Branch also has standing because its product lowered barriers to entry for other competitors in the Android app distribution market. *See supra*, at 18-19; *Novell*, 505 F.3d at 316-18. Google uses its exclusionary agreements and monopoly power to require its own app distribution channel (the Play Store) to be preinstalled as the default on Android phones and assigns revenue shares based on such exclusivity. Compl.

¶¶ 146-49, 153, 158-60, 167-81. Discovery Search would have facilitated competition in that market by providing Android users a way to find and download, and app developers a mechanism to advertise, apps without using the Play Store. *Id*. ¶¶ 124, 128-30, 205. This "would have lowered the barriers to entry in the Android app distribution market," for example, "by bypassing the stickiness of defaults" like the Play Store and challenged Google's monopoly power. *Id*.; *see also id*. ¶ 158. Further, by offering an "alternative" distribution channel that would provide app developers a non-Google controlled avenue to reach users, such developers could avoid Google's supra-competitive download fees, *id*. ¶¶ 8, 111, 123, 128-30, 214-16, 233-37, 247-48, 303, 351.

**D.    Branch Has Antitrust Standing in the Search and Text Advertising Markets**

Google says that Branch "confusingly collapses" the search advertising market and search text advertising submarket, but the confusion is found in the Motion (at 10), not the Complaint. The Complaint is clear: Count One asserts unreasonable restraints of trade in *each* of the markets, including the search advertising market and its submarket for search text advertising. Compl. ¶¶ 243-54; *see id*. ¶¶ 131-39. Counts Eight and Nine assert monopolization and, in the alternative, attempted monopolization, in the search text advertising submarket. *Id*. ¶¶ 308-14, 316-22.

Google does not dispute that Branch sufficiently pleaded antitrust liability and standing in the search advertising market. Mot. at 10-11. Google's sole argument as to that market is that it purportedly lacks monopoly power, *id*. at 11, but that argument is inapposite because none of Branch's claims depend on Google having a monopoly in general search advertising. Rather, Count One asserts that Google unreasonably restrained trade in the search advertising market (among others) through exclusionary agreements it obtains by exploiting its "monopoly power in *Android app distribution and general search services*." Compl. ¶¶ 243-54. Google does not contest it monopolized the Android app distribution and general search services markets or that it used its monopoly power in those markets to unreasonably restrain trade in *the search advertising market*.

Mot. at 6-10, 11-12. Thus, the Motion does not challenge any as-pleaded theory of liability or standing as to the search ads market — and thus, it survives as to Count One as unchallenged.

Branch also has antitrust standing to bring its claims relating to the search *text* advertising submarket. That submarket is not, as Google claims, "limited to results on general search engines." Mot. at 11. It is the market for "[s]earch text advertisements, or 'text ads' [that] are displayed in response to a user's query." Compl. ¶¶ 131, 135. Faced with the reality of Branch's well-pleaded market definition, which controls at this stage, the Motion incorrectly resorts to claiming that Branch makes "threadbare" allegations that Branch competes in this market. Mot. at 11.

Google's claim is based on one paragraph of the Complaint, but Branch repeatedly alleged its status as a competitor (or at minimum, nascent competitor) in the market for displaying search text ads. Branch alleged that it uses "in-house ad technology infrastructure" to provide advertisers space to "offer install and reengagement campaigns served by paid search advertising, including text ads, and zero state (i.e., in the pre-search state of the device) interactive ads," Compl. ¶¶ 16, 50, 117, 137 & Fig. 4, and was configured to display web content not limited to "Android apps" (*contra* Mot. at 11), *id*. ¶¶ 17, 87. Branch "actually succeeded in" providing search text ads, as corroborated by its ability to obtain limited implementation with Samsung, and had the infrastructure, staff, and capital to do so on a larger scale, but-for Google's anticompetitive conduct. *Id*. ¶¶ 17, 42, 69, 70, 121-22, 139; *see Sanger*, 802 F.3d at 740.

Branch also plausibly alleged that it competed with platforms Google uses to display text ads in response to a user's query. Compl ¶¶ 135, 139; *see, e.g.*, *id*. ¶¶ 8, 16, 46, 50, 100, 117-130, Figs. 4-6 (Discovery Search competes with app distribution channels like the Play Store) & 14-17, 45-48, 55-56, 74, 85-100 (Discovery Search competes with Google Search). "If consumers searched for apps on Discovery Search, rather than through Google, that threatens not only to lead

consumers to apps outside of the Google Play Store, but also reduces traffic on Google Search, *which in turn reduces advertising revenue Google receives through [the same]*." *Id*. ¶ 124; *see id.* ¶ 99. Google's "interchangeability" fact dispute (at 11) ignores the well-pleaded allegations.

Branch also asserted independent theories of standing as to this market that the Motion does not mention, let alone rebut. Specifically, Google does not dispute that (1) Google used its monopoly power in the general search services and Android app distribution markets to directly target Branch with exclusionary conduct that restrained trade in the search text advertising submarket, *e.g.*, Compl. ¶¶ 9, 17-19, 23-24, 77-84, 109-16, 137-38, 147-78, 238-42, 351; or (2) Google's exclusionary contracts thwarted Branch's ability to gain scale in the search text advertising market and compete for advertisers' dollars at better rates than Google through an innovative platform untethered to Google algorithms, *id*. ¶¶ 9, 16, 97, 124, 139, 222, 240-42.

*    *    *

In sum, across all of the relevant markets, Branch's asserted injury — exclusion from the relevant markets and the resulting financial loss, *see*, *e.g.*, Compl. ¶¶ 31, 51-53, 118-30, 140-77, 214-18 — is sufficient for standing because it "reflects an anticompetitive aspect of the defendant's conduct." *Pulse Network*, 30 F.4th at 488 (quotations omitted). Under Fifth Circuit precedent, Google's foreclosure of Discovery Search from distribution "is textbook antitrust injury," *id.* at 491, and "standing should not become the tail wagging the dog in 'classical' antitrust cases such as this one by an allegedly excluded competitor." *Doctor's Hosp.*, 123 F.3d at 306.

***Proper Plaintiff***. Branch also adequately alleged that it is a proper plaintiff. Google claims some unspecified "actual market participant[]" "*could* bring their own claims," supposedly making Branch an improper plaintiff. Mot. at 12. But Branch *is* an "actual market participant," as explained above for each of the relevant markets. And, if Google intended to challenge Branch's status as a

24

"proper plaintiff," Google did not even address the relevant factors for that inquiry. *See Doctor's Hosp.*, 123 F.3d at 305; *Pulse*, 30 F.4th at 494. Each squarely supports Branch. *First*, Branch's exclusion from the market, loss of deals with OEMs and carriers, and lost profits flow directly from Google's exclusionary contracts and direct targeting of Branch. Compl. ¶¶ 118-30, 140-77, 214-16. *Second*, other parties' harms are "no more direct than the ones [Branch] claims" here, *Pulse*, 30 F.4th at 494, where Google used its unlawful conduct and power to force distributors not to install Branch Discoery specifically, directly injuring Branch. Compl. ¶¶ 17-19, 23-24, 51-52, 90, 123, 128-30, 140-77, 214-17, 233-37, 247-48, 303; *cf. Google*, 747 F. Supp. 3d at 104-06. *Third*, Branch's damages are concrete, not speculative, sustained only by Branch, and no other party could recover them. Compl. ¶¶ 31, 51-53, 218, 236-37; *see TravelPass*, 2019 WL 5691996, at *26. There simply is no "risk" of "duplicative recoveries" or "complex damage apportionment," contrary to Google's conclusory assertions otherwise. *See* Mot. at 10.

## II.    BRANCH PLAUSIBLY ALLEGED UNLAWFUL TYING

Google's challenge to Branch's tying claims is narrow. Google does not challenge the substance of Branch's tying claims, but rather asserts only that Branch (1) did not adequately define an Android app search services market; and (2) did not plausibly allege anticompetitive or adverse effect in the Android app search services market. Mot. at 17 (failing to contest anticompetitive effect in general search services). Neither argument is correct.

Google's first argument fails for the reasons explained in Section I. Branch adequately alleged a market for Android app search services. *See* Compl. ¶¶ 54-62; *supra*, at 7-12. Google's factual disputes regarding the contours of that product market are premature. *Silicon Servs.*, 2007 WL 9701128, at *4; *OrthoAccel*, 2017 WL 1213629, at *4. And contrary to Google's suggestion, there is no requirement that Branch must plead that its product is in one, and only one, market. Branch can plead in the alternative, *see* Fed. R. Civ. P. 8(d)(2)-(3), and need not elect, in its

complaint, "one particular theory." *Huffman v. Union Pac. R.R.*, 675 F.3d 412, 418 (5th Cir. 2012).

Next, Google argues that Branch did not plausibly allege anticompetitive effects in the Android app search services market. That is demonstrably incorrect. The Complaint contains a three-page section on this precise issue. *See* Compl. ¶¶ 219-25. Through its anticompetitive conduct, "Google coerces Android distributors not to install alternative search products, including application search products, like Branch Discovery Search" and ensures an "all or nothing" "Google solution," thereby excluding competition in the market and reducing output, innovation, and choice. *Id*. ¶¶ 142-53, 158-60, 219-32, 258, 263, 273. These effects are not limited to Branch as a competitor in Android app search services (as Google claims, *see* Mot. at 17). Rather, Branch alleged that Google's conduct has caused "competitive harms *across this market*, including to competing application search firms, OEMs, app developers, Android app distributors, and consumers." *Id*. ¶¶ 219-25. Branch included specific allegations of anticompetitive effects as to *each* of these market participants, all of which the Motion failed to address. *See, e.g.*, *id.* ¶ 220 (competitors); ¶ 221 (OEMs); ¶ 222 (app distributors and developers); ¶¶ 224-25 (consumers).

In sum, Branch more than adequately alleged anticompetitive effects in the Android app search services market, and the Motion fails to identify any basis for dismissal of the tying claims. Branch properly alleged that (1) Google uses its monopoly power in general search and Android app distribution to tie the Play Store and Google Search to a *prohibition* on Android distributors installing any non-Google alternative search product, including Discovery Search, *see* Compl. ¶¶ 255-64 (Count 2); and (2) Google uses its monopoly power in Android app distribution, through the Play Store, to restrain competition in Android app search and general search by *affirmatively* requiring distributors to take not just the Play Store but also Google Search, *id.* ¶¶ 265-74 (Count 3). Both are valid theories of relief. *See Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S.

451, 461 (1992) ("A tying arrangement is an arrangement by a party to sell one product but only on the condition that the buyer also purchase a different (tied) product, or at least agrees that he will not purchase that product from any other supplier." (quotations omitted)).[10]

## III.    BRANCH PLAUSIBLY ALLEGED TORTIOUS INTERFERENCE

Branch's Complaint contains detailed allegations "to draw the reasonable inference," *Gonzalez*, 577 F.3d at 603, that Google is liable for tortious interference with prospective contractual or business relations under Texas and California law. Google again improperly cherry-picks certain paragraphs in the Complaint, argues that those paragraphs do not include sufficient allegations to state a claim, and simply ignores dozens of other allegations that obviously do.

*First*, Google is wrong that Branch failed to allege a "reasonable probability" of business relationships but for Google's interference. To meet this element, pleading "a pre-existing business relationship can suffice." *Loco Brands, LCC v. Butler Am., LLC*, 2019 WL 3015046, at \*9 (E.D. Tex. Jan 28, 2019). The Complaint plainly meets that standard. For example, as Google's pre-suit documents recognized, Branch had "a pre-existing business relationship" with Samsung, an "identified buyer," *id.*, for Discovery Search "*to become standard across all of Samsung's upcoming devices*." Compl. ¶¶ 17, 170-74, 368-69, Figs. 1-2. But Google interfered to "stop the functionality," which "forced [Samsung] to terminate its discussions with Branch." *Id.* ¶¶ 17, 21, 22-23, 90, 120, 173-77. Google also knew "AT&T [wa]s considering working directly with Branch," but after Google interfered, "AT&T worried about 'risks associated with' partnering with

---

[10] *See also, e.g.*, *Fotobom*, 719 F. Supp. 3d at 50-52 (plaintiff stated tying claim that Google "leverages its control over" mobile products to force distributors to accept its preloaded keyboard, which causes "anticompetitive market effects" such as the exclusion of keyboard apps); *Crownalytics, LLC v. SPINS LLC*, 2023 WL 3071192, at \*9-10 (D. Colo. Apr. 25, 2023) (plaintiff stated tying claim where it "alleged that Defendants' sale of data is conditioned on customers' agreement not to use any third-party data analytics providers"); *Tiz, Inc. v. S. Glazers Wine & Spirits, LLC*, 2024 WL 2785142, at \*22-24 (May 30, 2024) (plaintiff stated tying claim where defendant conditioned access to its distribution services on the use of its e-commerce marketplace).

Branch because it could be 'considered a competing or alternative search,' and thus violate its RSA." *Id.* ¶ 29; *id.* ¶¶ 27, 29, 89, 91, 120, 173, 177, 368-69. AT&T then elected not to install "Discovery Search based on its anticompetitive agreements with Google." *Id.* ¶ 29.

These well-pleaded allegations more than suffice to state a claim for interference. They are not "vague assertions that future business relationships would possibly or potentially be harmed," as in *Stone v. FINRA*, 694 F. Supp. 3d 774, 79 (E.D. Tex. 2023), or "speculative economic relationships," as in *Rheumatology Diagnostics Lab'y*. Mot. at 19. In fact, another court has already recognized that Google's conduct foreclosed Branch's relationships with Samsung and AT&T. Compl. ¶¶ 19, 29, 26-30, 167-74; *Google*, 747 F. Supp. 3d at 104-06. "[C]onsidering all of the facts and circumstances," Branch adequately alleged that it was "reasonably probable" that it would have done business with Samsung, AT&T, and other OEMs and carriers but-for Google's interference. No more is required. *See North Cypress*, 2012 WL 2870639, at *7.[11]

*Second*, Google claims its conduct was not "independently unlawful" based solely on its (incorrect) contention that Branch lacks *antitrust* standing. Mot. at 19. Branch has such standing for the reasons explained above, but Google also is wrong to suggest that Branch must have *antitrust* standing to prove unlawful interference under state law. The Texas Supreme Court has rejected this exact argument. *In re Memorial Hermann Hospital System*, 464 S.W.3d 686, 713 (Tex. 2015) ("Even if Dr. Gomez himself would not have standing to bring a suit under [Texas antitrust law] based on antitrust injury to Methodist West, Dr. Gomez could rely on the violation to show that the interference with his prospective business relations was independently wrongful."). Branch needed only to allege independently unlawful conduct: It did so by alleging

---

[11] Google also cites *Santander Consumer USA v. Ziegler*, 2017 WL 2729998 (N.D. Tex. June 26, 2017), but that case is inapposite. The plaintiff there failed to plead *any* facts that the defendant even "communicated with prospective customers about prospective" business. *Id.* *9-12.

28

Google's conduct "could" (and did) "subject [it] to liability under the Sherman Act." *MVConnect, LLC v. Recovery Database Network, Inc.*, 2011 WL 13128799, at *9 (N.D. Tex. May 27, 2011).

*Third*, Google claims that "Branch has not alleged proximate causation," but this again ignores Branch's allegations that the harm to its business relationships resulted directly from Google's interference. Compl. ¶¶ 17, 21-23, 27, 29, 52, 89-92, 120, 170-77, 215-17, 369, Figs. 1-2. Google's claim that it could not "have foreseen" that its anticompetitive conduct would block Discovery Search is belied by its own documents, which show Google "moved against Branch *because of* Google's express concern that Discovery Search created an alternative access point set to become standard across all of Samsung's upcoming devices" and had to "stop the functionality." *Id*. ¶¶ 17-19, 52, 92, 173. Similarly, to suggest now that there were "legitimate" reasons for Google's interference, Mot. at 19, is a procedurally improper factual dispute. It is also wrong: after a nine-week trial, no legitimate reason for was found for Google's misconduct. Compl. ¶ 188; *Google*, 747 F. Supp. 3d at 171-77.

*Fourth*, Google claims that Branch did not adequately allege damages, but that is meritless. Branch "explain[ed] how or whether [it] suffered any actual damage or loss." *BHL Boresight, Inc. v. Geo-Steering Solutions, Inc*., 2016 WL 8648927, *12 (S.D. Tex. Mar. 29, 2016). Google prevented Discovery Search from being integrated on Androids and denied it "the business, sales, distribution, revenues, and profits that Discovery Search would achieve through monetizing distribution channels but-for Google's illegal conduct." Compl. ¶ 52; ¶¶ 17-18, 21, 31, 51-53, 97-100, 130, 139, 215-17, 220, 235, 242. That is enough. *See MVConnect*, 2011 WL 13128799, *9.

## IV.    BRANCH PLAUSIBLY ALLEGED STATE LAW ANTITRUST CLAIMS

Google challenges Branch's state law antitrust claims "for the same reasons [as] Branch's federal antitrust claims." Mot. at 20-21. Thus, Google's arguments as to the state antitrust claims should be denied for the reasons explained in Sections I and II. Moreover, Google also is wrong

that antitrust standing under California's Cartwright Act is the same as federal law. *See Knevelbaard Dairies v. Kraft Foods, Inc*., 232 F.3d 979, 991 (9th Cir. 2000) ("the more restrictive definition of antitrust injury under federal law does not apply to the Cartwright Act") (cleaned up). For those claims (Counts 13-14), Branch need allege only that it was "within the target area of the alleged violation—the area which it could reasonably be foreseen would be affected by the antitrust violation." *In re Cal. Gasoline Spot Market Antitrust Litig*., 2022 WL 3215002, *2-3 (N.D. Cal. Aug. 9, 2022). Branch alleged far more than being "within the target area" of the violation: Google "intentionally and specifically targeted Branch as a rival." Compl. ¶ 11.

## V.    IN THE ALTERNATIVE, BRANCH SHOULD BE PERMITTED TO AMEND

Branch adequately stated valid claims for relief and Google is not entitled to dismissal of any Count. If the Court were to find a pleading deficiency, however, Branch requests leave to amend. There is no basis for dismissal "with prejudice." The law is clear that, "in the absence of any apparent reason (e.g., undue delay, bad faith or dilatory motive, repeated failure to cure deficiencies by previously allowed amendments, undue prejudice to the opposing party, futility), leave to amend should be freely given, as Rule 15 requires." *Thomas v. Chevron U.S.A., Inc*., 832 F.3d 586, 590 (5th Cir. 2016). The Motion provides no basis to depart from Rule 15 here.

Dated: May 2, 2025                              Respectfully submitted,

*/s/ Alex Kaplan*
Neal Manne
Alex Kaplan
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston TX 77002
Tel: (713) 651-9366
Fax: (713) 654-6666
nmanne@susmangodfrey.com
akaplan@susmangodfrey.com

John Schiltz
Danielle Nicholson
SUSMAN GODFREY L.L.P.
401 Union Street, Suite 3000
Seattle, WA 98101
Tel: (206) 505-3841
Fax: (206) 516-3883
jschiltz@susmangodfrey.com
dnicholson@susmangodfrey.com

Zachary B. Savage
SUSMAN GODFREY L.L.P.
One Manhattan West
New York, NY 10001-8602
Tel: (212) 336-8330
Fax: (212) 336-8340
zsavage@susmangodfrey.com

Of Counsel:
Claire Abernathy Henry
State Bar No. 24053063
claire@millerfairhenry.com
MILLER FAIR HENRY, PLLC
1507 Bill Owens Parkway
Longview, Texas 75604
(903) 757-6400 (telephone)
(903) 757-2323 (facsimile)

Steven C. Holtzman
20 Hillcrest Road
Berkeley CA 94705
(510) 333-4612
Sholtzman10@outlook.com

***Counsel for Branch Metrics, Inc.***

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that on May 2, 2025, all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system.

*/s/ Alex Kaplan*             

Alex Kaplan
*Counsel for Plaintiff*
